UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF WISCONSIN

_____

In re

ANTOINETTE BENTON

              Debtor.

_____

HARRY KAUFMANN MOTORCARS, INC.,

              Plaintiff,

v.

ANTOINETTE S. BENTON,

              Defendant.

Case No. 14-33505

Chapter 7

Adversary No. 15-2067

_____

**MEMORANDUM DECISION**
_____

     This matter came before the Court on Harry Kaufmann Motorcars, Inc.'s ("Kaufmann") complaint to determine dischargeability of debt, based on a fraudulent check tendered for the down payment on a vehicle purchased by Antoinette S. Benton ("Ms. Benton"). The Court held a trial on September 3, 2015, and took the matter under advisement to allow the parties an opportunity to address additional issues. Kaufmann submitted a brief on September 24, 2015, and the issue is now ripe for decision. This Court has jurisdiction under 28 U.S.C. § 1334, and this is a core proceeding under 28 U.S.C. § 157(b)(2)(I). This decision constitutes the Court's findings of fact and conclusions of law under Federal Rule of Bankruptcy Procedure 7052.

BACKGROUND

     Ms. Benton and Edward J. Youngblood, her boyfriend at the time, purchased a 2007 BMW 7 Series from Kaufmann on December 2, 2013. To purchase the vehicle, Ms. Benton

applied for financing, and a third-party lender agreed to finance a portion of the purchase price. Ms. Benton's original financing request called for a $5,000 down payment, which was rejected in favor of a $10,000 down payment from Ms. Benton. The total purchase price was $30,000. Upon delivery of the vehicle, Ms. Benton signed all the required paperwork, and Mr. Youngblood submitted a check to Kaufmann in the amount of $9,800.00. Two hundred dollars had been previously paid. The check was later found to be written against a nonexistent corporate account. Ms. Benton and Mr. Youngblood agreed to repay the obligation to Kaufmann, and they have made a number of payments toward the outstanding balance. The total remaining obligation owed to Kaufmann is $6,800.00. Ms. Benton filed a Chapter 7 petition on October 31, 2014, and Kaufmann commenced this adversary proceeding on February 5, 2015.

## ARGUMENTS

Ms. Benton argued at trial that she was as much defrauded by Mr. Youngblood as Kaufmann in this case. She testified that she did not know that the required down payment was $10,000 when she picked up the vehicle; instead, she believed that the amount owed was $5,000. She denied having a conversation with any of the dealership's representatives regarding the increased down payment. According to Ms. Benton, Mr. Youngblood had agreed on his own to take care of the down payment, but she denied seeing a check exchanged between Mr. Youngblood and Kaufmann. Ms. Benton also denied having any conversations with Kaufmann regarding repayment of the worthless check, despite admitting that she made several payments to the dealership.

Conversely, Kaufmann highlighted the incredibility of Ms. Benton's testimony, noting that her version of events differed sharply from Kaufmann's representatives' testimony.

Kaufmann argued that based on her testimony, Ms. Benton knew or should have known that Mr. Youngblood did not have $9,800 available to him as he was not employed at the time and for some time prior to the purchase. Furthermore, the check for back payment of his disability benefits – his sole source of income at the time – was only $7,500. Thus, she knew or should have known that any check Mr. Youngblood presented for the purchase of her vehicle was fraudulent or a "bad check." Kaufmann also cited Ms. Benton's lack of candor regarding her living situation, her address, and her relationship with Mr. Youngblood at the time of the purchase of the vehicle as evidence of Ms. Benton creating a false or misleading set of circumstances meant to induce Kaufmann to sell her the vehicle.

Kaufmann cited several cases[1] in its letter brief demonstrating that a false representation need not be overt or spoken, and concealment or silence can in some contexts constitute a fraudulent misrepresentation. *See Bay State Milling Co. v. Martin*, 916 F.2d 1221 (7th Cir. 1990) (noting that a misrepresentation need not be conveyed by words, but may be conveyed by actions as well); *Port Louis Owners Ass'n v. Savage (In re Savage),* 366 B.R. 574, 583 (Bankr. E.D. La. 2007), *rev'd on other grounds*, *Savage v. Port Louis Owners Ass'n (In re Savage)*, 333 F. App'x 831 (5th Cir. 2009) ("When one has a duty to speak, both concealment and silence can constitute

---

[1] Only one case cited by Kaufmann involved tender of a bad check, but the case was neither factually similar nor supportive of Kaufmann's position. In *Goldberg Secs., Inc. v. Scarlata (In re Scarlata)*, 979 F.2d 521 (7th Cir. 1992), a market maker tendered a check for $30,000 to a creditor when he only had $22,000 in his account. He subsequently put the necessary funds in his account, and the check never bounced. However, the creditor had also guaranteed the debtor's failed trades to the tune of $5 million. Following *Williams v. United States*, 458 U.S. 279 (1982), the Seventh Circuit Court of Appeals reasoned that the debtor's check was not a false pretense under § 523(a)(2)(A), and even if tendering a bad check did satisfy the requirement of a misrepresentation, explained the court, the debtor's check in *Scarlata* cleared. Here, the check in question was not written or presented by Ms. Benton.

fraudulent misrepresentation; an overt act is not required. Moreover, a misrepresentation need not be spoken; it can be made through conduct.").

## DISCUSSION

Kaufmann objects to dischargeability of the debt owed by Ms. Benton under 11 U.S.C. § 523(a)(2). The burden is on the objecting party to prove exceptions to discharge. *Goldberg Secs., Inc. v. Scarlata (In re Scarlata)*, 979 F.2d 521, 524 (7th Cir. 1992) (citation omitted). The party objecting to discharge must establish an exception to discharge by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991). It is well-established that "'exceptions to discharge are to be construed strictly against a creditor and liberally in favor of the debtor.'" *Scarlata*, 979 F.2d at 524 (quoting *In re Zarzynski*, 771 F.2d 304, 306 (7th Cir. 1985)).

Since Kaufmann made no allegations regarding a financial statement, the Court will only consider whether or not the facts established at trial support an exception to discharge under § 523(a)(2)(A). Under § 523(a)(2)(A), a debtor is precluded from discharging any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud." To succeed on a § 523(a)(2)(A) claim, the creditor must establish: (1) that the debtor made a false representation that the debtor either knew was false or was made with such reckless disregard for the truth as to constitute willful misrepresentation; (2) the debtor possessed an actual intent to defraud; and (3) the creditor justifiably relied on the representation and was damaged thereby. *Field v. Mans*, 516 U.S. 59, 73 (1995); *Ojeda v. Goldberg*, 599 F.3d 712, 717 (7th Cir. 2010).

A bad check can form the basis of a nondischargeability action under § 523(a)(2)(A), but numerous bankruptcy courts have found that simply presenting a bad check on its own is

4

insufficient to establish nondischargeability.  *See KC Coring & Cutting Constr., Inc. v. McArthur (In re McArthur)*, 391 B.R. 453, 457 (Bankr. D. Kan. 2008) ("An insufficient funds check, standing alone, is not a false statement. . . . Simply 'playing the float' to cover checks tendered in payment for a preexisting debt is insufficient."); *Mega Marts, Inc. v. Trevisan (In re Trevisan)*, 300 B.R. 708, 716 (Bankr. E.D. Wis. 2003) (finding that a check is not a representation of any kind).

Nevertheless, some courts have found that a worthless check *can* form the basis of a nondischargeability action.  *See, e.g., In re Strecker*, 251 B.R. 878, 882 (Bankr. D. Colo. 2000) ("The mere issuance of a 'bad check,' standing alone, is not grounds for a determination that such debt is not dischargeable pursuant to 11 U.S.C. § 523(a)(2). . . . A determination that such a debt is non-dischargeable can only be established if the debtor did not intend to pay the creditor when the check was issued and knew the check would bounce."); *Meramec Valley Bank v. Newell (In re Newell),* 164 B.R. 992, 995 (Bankr. E.D. Mo. 1994) ("Ordinarily, the 'delivery of an ultimately-dishonored check, *without more*, does not constitute an actionable representation under § 523(a)(2)(A).'  However, when surrounding circumstances indicate that a debtor intended to deceive a creditor when issuing an insufficient funds check, and when a debtor knew that sufficient funds did not exist, a debtor is not entitled to a discharge of the debt.") (internal citations omitted); *Jarboe Sales Co. v. Degraffenreid (In re Degraffenreid)*, 131 B.R. 178, 180 (Bankr. N.D. Okla. 1991) (finding debtors did not make false representation by presenting bad checks for payment, except where evidence demonstrates checks were given with intent not to pay and knowing checks would bounce); *Stone v. Feldman (In re Feldman)*, 111 B.R. 481, 485 (Bankr. E. D. Pa. 1990) (noting debtor's knowledge that checks would not be honored

5

distinguished case and satisfied requirement of false representation). As the court noted in *Newell*, the United States Supreme Court decision in *Williams* has convinced some courts to find that a check is not a representation, but the court explained that the Supreme Court reached this conclusion when deciding whether an insufficient funds check satisfied one of the elements of a criminal statute. *Newell*, 164 B.R. at 995 n.3. This Court need not revisit that issue.

As Ms. Benton did not specifically tender the worthless check to Kaufmann herself, nor did she make any specific, overt representations regarding the financial viability of the check, it is unlikely that Mr. Youngblood's presentation of the worthless check on its own would satisfy the elements of a nondischargeability claim against Ms. Benton under § 523(a)(2)(A). However, there are additional circumstances material to this transaction. A fundamental issue in this case is whether Ms. Benton had a duty to disclose information to Kaufmann when she knew Mr. Youngblood could not possibly make the required down payment and whether her silence can be construed as a false representation, false pretense, or actual fraud. If allowing Mr. Youngblood to make the down payment with what she had to have known was a fraudulent check was part of a scheme to obtain the car without fully paying for it, she is culpable for her participation in that scheme.

Recently, in *Landmark Credit Union v. Reichartz (In re Reichartz)*, 529 B.R. 696 (Bankr. E.D. Wis. 2015), Judge Kelley addressed § 523(a)(2)(A) under a "false pretenses" and "actual fraud" analysis, separate from a "false misrepresentation" made by the debtors. There, Judge Kelley noted that while the "prototypical debt within the scope of § 523(a)(2)(A) involves misrepresentation, the section also includes 'false pretenses' and 'actual fraud.'" *Id.* at 699. According to the court of appeals in *McClellan v. Cantrell*, 217 F.3d 890, 893 (7th Cir. 2000)

6

(quoting *Stapleton v. Holt*, 250 P.2d 451 (Okla. 1952)), "'[f]raud is a generic term, which embraces all the multifarious means which human ingenuity can devise and which are resorted to by one individual to gain an advantage over another by false suggestions or by the suppression of truth.'" Therefore, § 523(a)(2)(A) encompasses a broader category of debts than misrepresentation, including those involving "'any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another.'" *Id.* (quoting 4 *Collier on Bankruptcy* ¶ 523.08[1][e] (15th ed. 2000)). *See also Deady v. Hanson (In re Hanson)*, 432 B.R. 758, 771 (Bankr. N.D. Ill. 2010) ("False pretenses in the context of § 523(a)(2)(A) include implied misrepresentations or conduct intended to create or foster a false impression.").

A bankruptcy court further defined false pretenses as:

> [A] series of events, activities or communications which, when considered collectively, create a false and misleading set of circumstances, or false and misleading understanding of a transaction, in which a creditor is wrongfully induced by the debtor to transfer property or extend credit to the debtor. . . . A false pretense is usually, but not always, the product of multiple events, acts or representations undertaken by a debtor which purposely create a contrived and misleading understanding of a transaction that, in turn, wrongfully induces the creditor to extend credit to the debtor. A "false pretense" is established or fostered willfully, knowingly and by design; it is not the result of inadvertence.

*Sterna v. Paneras (In re Paneras)*, 195 B.R. 395, 406 (Bankr. N.D. Ill. 1996) (quoting *Evans v. Dunston (In re Dunston)*, 117 B.R. 632, 641 (Bankr. D. Colo. 1990)). Overt misrepresentations are not a prerequisite for a false pretenses claim. *Memorial Hosp. v. Sarama (In re Sarama)*, 192 B.R. 922, 928 (Bankr. N.D. Ill. 1996). "Instead, omissions or a failure to disclose on the part of

7

the debtor can constitute misrepresentations where the circumstances are such that omissions or failure to disclose create a false impression which is known by the debtor." *Id.*

Thus, silence or concealment may constitute false pretenses. *Fosco v. Fosco (In re Fosco)*, 289 B.R. 78, 86 (Bankr. N.D. Ill. 2002). As the court of appeals noted in *Caspers v. Van Horne (In re Van Horne)*, 823 F.2d 1285, 1288 (8th Cir. 1987), "[b]ankruptcy courts have overwhelmingly held that a debtor's silence regarding a material fact can constitute a false representation actionable under section 523(a)(2)(A)." The Eighth Circuit went on to hold that a borrower has a duty to disclose all material facts to the lender, meaning that the creditor has a right to "know those facts touching upon the essence of the transaction." *Id.* In *Check Control, Inc. v. Anderson (In re Anderson),* 181 B.R. 943, 951 (Bankr. D. Minn. 1995), a case involving insufficient fund checks written to a casino, the court aptly described the circumstances under which a debtor's silence may satisfy the code's requirements:

> [W]here the debtor has possession of material information that may bear on the creditor's willingness to extend a financial accommodation to him; knows that the creditor would consider it; fails to disclose it; creates or allows the creation of the semblance of a very different state of affairs; and reinforces that imposture by the withholding of the material information, the debtor has acted in a way to trigger § 523(a)(2)(A).

Although there is a distinct lack of case law involving circumstances similar to the matter before this Court, the Court draws support from cases involving concealment of a material fact rather than an overt misrepresentation. For example, in *Reichartz*, 529 B.R. 696, the case involved a car loan made to the debtors who acted as "straw borrowers" for an acquaintance who owned a car dealership. Under their agreement, the debtors took out loans to purchase vehicles from the dealership, and the dealer had promised to repay the loans when he sold the cars. The

8

loans were never repaid, but the debtors argued that they always intended to pay the creditor as soon as the cars were sold. However, the court determined that the debtors' deposition testimony that they did not intend to deceive the creditor was inconsistent with their actions. The debtors should not have remained silent as to the purpose of the loans, which was a material term of the loan transaction. *Id.* at 700. *See also Citizens & S. Nat'l Bank v. Thomas (In re Thomas)*, 12 B.R. 765 (Bankr. N.D. Ga. 1981) (debtor demonstrated intent to deceive where he purchased vehicle for friend with bad credit and concealed fact from creditor).

In this case, Ms. Benton's behavior clearly satisfies the elements of a false representation, false pretense, or actual fraud. Her communication, or lack thereof, created a false and misleading understanding of the transaction, which Kaufmann justifiably relied upon to its detriment. Kaufmann's representatives, Peter Obradovich and Harry Kaufmann, testified that Ms. Benton, through her statements and actions, gave them the impression that she and Mr. Youngblood were engaged, living together, and planning to get married. Ms. Benton knowingly participated in creating the impression of a couple with a rosy, prosperous future. In fact, the couple was not engaged, they were "going through a rough patch," and she was "transitioning" out of the residence she disclosed as her address.

Furthermore, Ms. Benton also helped to perpetrate a false impression regarding the couple's financial viability. Mr. Youngblood disclosed to Kaufmann that he owned his own trucking business. At trial, Ms. Benton stated that she was unaware of a trucking business, which Kaufmann's representatives testified was a factor in accepting the worthless check. Nevertheless, even if she did not know Mr. Youngblood had a trucking business or claimed to have a business – and this court is highly skeptical – she knew that at the time of the purchase of

9

the vehicle Mr. Youngblood had not worked for some time due to a medical condition. She also knew that he was either awaiting or had just received a disability payment of $7,500. Ms. Benton's knowledge of Mr. Youngblood's finances shows she had to know any check he presented was fraudulent, and that it was impossible for him to "take care" of the down payment. Still, she pretended to be part of a financially secure, stable relationship, let him hand over a worthless check, and got delivery of the car.

If her testimony were to be believed, Ms. Benton turned a blind eye to where the down payment for the vehicle was coming from. Her initial agreement with Mr. Youngblood was that he would pay half of the original $5,000 down payment (later increased to $10,000), and she would pay the other half from her savings account. Because he was "taking care" of the down payment, she tendered no funds at delivery of the vehicle. Ms. Benton, and only Ms. Benton, signed all the purchase documents, which clearly showed a $10,000 down payment. Her excuse for not noticing the $10,000 down payment and $20,000 additional financing on the documents was that it was after office hours, approximately 7:00 at night, which was both nonsensical and plainly not credible. She testified she did not see Mr. Youngblood give the bad check to Mr. Obradovich, but seeing the check itself was not necessary given the clear evidence in the financing documents she signed.

Ms. Benton is trying to use the classic ostrich defense. She knew that Mr. Youngblood had not been employed for some time, and that she was the breadwinner of the household. She apparently never questioned Mr. Youngblood about the source of the funds for the down payment before allowing him to submit a fraudulent check on her behalf, and she never alerted Kaufmann to a possible problem with the check either before or at the time she signed the financing

documents. Thus, she benefitted from and participated in the fraud that allowed her to obtain the BMW.

Even in the absence of explicit questioning by Kaufman, Ms. Benton should have revealed the impossibility of Mr. Youngblood's ability to submit the down payment to Kaufmann, and her failure to disclose it was not inadvertent. Ms. Benton's calculated concealment of such information constitutes a willful misrepresentation under 11 U.S.C. § 523(a)(2)(A).

The final element under 11 U.S.C. § 523(a)(2)(A) requires that the creditor must have justifiably relied on the representation. Here, Kaufmann's representatives testified that Mr. Youngblood told them that he owned a trucking business and was on the road a lot. This was material to the creditor's reliance on the legitimacy of the transaction because the worthless check appeared to be a check from a business. The appearance that both parties were working and about to be married helped induce Kaufmann to rely on the tender of that check. That reliance was justifiable under the circumstances.

## CONCLUSION

In conclusion, the debt owed by Ms. Benton to Kaufmann is found to be excepted from discharge under 11 U.S.C. § 523(a)(2)(A) as Kaufmann sufficiently demonstrated the elements necessary to establish nondischargeability. A separate order will be entered accordingly.

October 20, 2015

Margaret Dee McGarity
United States Bankruptcy Judge